**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DR. SOLOMON WILLIAMS OBOTETUKUDO,** | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Civil Action No. 13-0639** |
| | ) | |
| **CLARION UNIVERSITY, *et al.*,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

### I.      Introduction

This matter is before the court upon a motion to dismiss (ECF No. 23) filed on behalf of Clarion University of Pennsylvania ("Clarion University") and each of the following individual defendants: Dr. Joseph P. Grunenwald, Dr. Karen M. Whitney, Dr. Stanton W. Green, Dr. Valentine U. James, Dr. Ron Nowaczyk, Dr. Stephen A. Johnson, Dr. Rachelle C. Prioleau, Barry L. McCauliff, Dr. Susan M. Hilton, Dr. Myrna F. Kuehn, Dr. Jocelind E. Gant, and Timothy P. Fogarty (collectively the "individual defendants" and together with Clarion University the "defendants").  This court has jurisdiction pursuant to 28 U.S.C. § 1331.  For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

### II.      Factual Background

As plaintiff Dr. Solomon Williams Obotetukudo ("Dr. Obotetukudo" or "plaintiff") is proceeding *pro se,* the factual allegations in his complaint are to be liberally construed.[1] Erickson v. Pardus, 551 U.S. 89, 94 (2007). Clarion University, the primary defendant in this action, is one of the fourteen academic universities comprising the Pennsylvania State System of Higher Education. (ECF No. 4 ¶ 5.) From 1994 through 2011, Clarion University employed Dr. Dr. Obotetukudo as an associate professor. (Id. ¶ 2.) In 1999 Dr. Obotetukudo earned tenure at Clarion University. (Id.) Each of the individual defendants was a university administrator at some point during Dr. Obotetukudo's employment at Clarion University. (Id. ¶¶ 7-22).

Throughout his employment at Clarion University, Dr. Obotetukudo, a naturalized United States citizen born in Nigeria, engaged in various activities designed to encourage the university to hire and retain minority faculty members. For example, from 1997 through 1999, Dr. Obotetukudo hosted an "All-Minority Scholars Conference." (Id. ¶ 48.) In March 2001, Dr. Obotetukudo organized a meeting of Clarion University's academic deans to highlight options the university could consider to increase the diversity of the tenured staff. (Id.) Dr. Obotetukudo contends that Clarion University and several of the individual defendants viewed these activities as "rabble rousing" and conspired to punish him by requiring him to submit to "Interim Performance Evaluations" each year from 2001 to 2011. (Id. ¶¶ 49-50, 52.) These interim evaluations routinely produced "negative and poor reviews" of his work performance. (Id. ¶¶ 53-54.) Dr. Obotetukudo contends that these negative performance reviews did not reflect his actual performance; rather, they were the product of defendants' concerted effort to halt his

---

[1] The court notes that the complaint is replete with conclusory legal statements. In crafting this factual summation, the court endeavored to separate legal conclusions from the well-pleaded factual allegations. See Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009) (instructing a court to separate "pleadings that . . . are no more than conclusions" from "well-pleaded factual allegations" that are entitled to a presumption of veracity).

professional advancement and damage his academic reputation in response to his social advocacy. (Id. ¶¶ 54-55.)

In addition to the negative performance reviews, Dr. Obotetukudo contends that Clarion University and the individual defendants engaged in a host of other activities designed to retaliate against him and undermine his standing with the university.[2] These activities include the following:

- Defendants intentionally embedded disruptive students in Dr. Obotetukudo's classes and offered them academic incentives to engage in distracting and hostile behavior in class for the purpose of disrupting Dr. Obotetukudo's lesson plans and classroom management. (Id. ¶¶ 63-64.)

- Defendants orchestrated a break-in of Dr. Obotetukudo's office and directed someone to steal his grade book in order to intimidate him and prevent him from calculating grades for his students. (Id. ¶ 67.)

- Defendants denied Dr. Obotetukudo sabbatical leave that he believes he should have been granted. (Id. ¶¶ 69, 120-22.)

- Defendants repeatedly denied Dr. Obotetukudo a promotion from assistant professor to full-time professor. (Id. ¶¶ 108-09.)

- Defendants embedded Muslim and Christian students in Dr. Obotetukudo's classes in order to "gauge [his] religiousness." (Id. ¶ 105.) Additionally, Dr. Prioleau, a Jehovah's Witness, repeatedly invited Dr. Obotetukudo to attend religious services and resorted to "intimidations and harassment" when he declined. (Id. ¶¶ 102-03.)

---

[2] Dr. Obotetukudo directs the vast majority of his accusations against defendants collectively, rather than identifying individual conduct.

- Defendants embedded Muslim students in Dr. Obotetukudo's classes to "gauge [his] patriotism, and potentials or proclivities toward violence and terrorism." (Id. ¶ 104.)

In December 2011, Clarion University terminated Dr. Obotetukudo's employment in the wake of an allegation of impropriety by a female student in one of his classes. (Id. ¶¶ 29, 92.) His termination letter, signed by Dr. Whitney, the university president, stated as follows:

> I conclude your actions toward [the student] were inappropriate and demonstrated a failure to follow University policy regarding interactions with students and staff. Specifically I found that both your written and verbal communications to [the student] created a hostile and threatening academic environment and interfered with the student's academic performance. Either of the foregoing alone is sufficient to warrant termination.

(Id.) Shortly thereafter, Dr. Obotetukudo filed a grievance wherein he alleged that defendants had failed to establish just cause for his termination as required by the university's Collective Bargaining Agreement ("CBA"). (Id. ¶¶ 30-32.) The grievance was ultimately pursued to arbitration and denied following a hearing. (ECF No. 23, Ex. A.)

III.    **Procedural History**

Dr. Obotetukudo commenced the instant action on May 6, 2013 by filing a fourteen-count *pro se* complaint challenging the circumstances of his employment and termination as a tenured assistant professor at Clarion University. (ECF No. 4.) The heart of the complaint centers on Dr. Obotetukudo's contention that defendants retaliated against and harassed him on the basis of his race, gender, age and religion in violation of the First, Fourth, Fifth and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, Title IX of the Educational Amendments of 1972

("Title IX"), 20 U.S.C. § 1681, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq*.  <u>See</u> Count Two ("Retaliation"); Count Three ("Hostile Work Environment"); Count Six ("Sex Discrimination"); Count Seven ("Age Discrimination"); Count Eight ("Religious Discrimination"); and Count Twelve ("Racial Discrimination").  Additionally, Dr. Obotetukudo raises several constitutional due process claims based upon alleged violations of Clarion University's CBA.  <u>See</u> Count One ("Wrongful Termination"), Count Four ("Violation of Due Process"), Count Five ("Abuse of Process"), and Count Eleven ("Breach of Provisions in Collective Bargaining Agreement").  His complaint also includes several inchoate claims that appear to lack any legal basis and are largely redundant.  <u>See</u> Count Nine ("Violation of Constitutional Rights"); Count Ten ("Conspiracy to Violate Federal Civil Rights"); and Count Thirteen ("Conflicts of Interest and Premeditated Acts").  Finally, he asserts a state law claim for Intentional Infliction of Emotional Distress.  <u>See</u> Count Fourteen.

Defendants filed their motion to dismiss on September 27, 2013.  (ECF No. 23.) Plaintiff filed a brief in opposition to that motion on November 6, 2013.[3]  (ECF No. 29.)  The matter is now fully briefed and ripe for review.

IV.     **Standard of Review**

A motion to dismiss tests the legal sufficiency of the complaint. <u>Kost v. Kozakiewicz</u>, 1 F.3d 176, 183 (3d Cir. 1993).  In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views

---

[3] Dr. Obotetukudo also filed a large binder full of exhibits in support of his brief in opposition to the motion to dismiss.  However, in determining whether claims should be dismissed under Rule 12(b)(6), "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record."  <u>Jordan v. Fox, Rothschild, O'Brien & Frankel</u>, 20 F.3d 1250, 1261 (3d Cir. 1994).

them in a light most favorable to the plaintiff.  U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002).  While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must provide more than labels and conclusions.  Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).  "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(Id.) (quoting Twombly, 550 U.S. at 556) (internal citations omitted).

Two working principles underlie Twombly.  Id.  First, with respect to mere conclusory statements, a court need not accept as true all of the allegations contained in a complaint.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555.)  Second, to survive a motion to dismiss, a claim must state a plausible claim for relief.  Id. at 679.  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Id. (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)).  "But where the well-pleaded facts do not permit the court

to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]- that the pleader is entitled to relief.'" Id. (quoting Fed. Rule Civ. Proc. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

> While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id.

A motion to dismiss for lack of subject-matter jurisdiction filed under Rule 12(b)(1) raises the issue whether the court has the power to hear the matter before it. Mortensen v. First Fed. Sav. & Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977). The plaintiff has the burden of persuasion and must prove that subject-matter jurisdiction exists. Id. at 891. "A plaintiff's failure to exhaust his administrative remedies is a jurisdictional issue, such that the appropriate device to raise [that] issue is a motion to dismiss under Rule 12(b)(1) for lack of subject matter jurisdiction." Swope v. Central York Sch. Dist., 796 F.Supp.2d 592, 599 (M.D. Pa. 2011) (citing W.B. v. Matula, 67 F.3d 484, 492-93 (3d Cir. 1995)).

**IV.    Discussion**

As noted above, Dr. Obotetukudo primarily alleges that Clarion University and the individual defendants discriminated and retaliated against him on the basis of his gender, ethnicity, religion and age. He also contends that defendants failed to follow the procedures set forth in the CBA in the course of terminating his employment. Each of his claims will be discussed in detail below.

**A. Wrongful Termination (Count One)**

As a faculty member at Clarion University, Dr. Obotetukudo was a member of a union whose relationship with the university was governed by a CBA. (ECF No. 4 ¶¶ 23, 26.) In Count One of his complaint, Dr. Obotetukudo alleges that Clarion University and the individual defendants terminated his employment without properly establishing "just cause" as required by the CBA.

Although not invoked by plaintiff, the court recognizes that § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), confers federal jurisdiction over suits alleging violations of contracts between an employer and a labor organization representing employees. See 29 U.S.C. § 185(a). It is axiomatic, however, that an aggrieved employee "[is] required to exhaust the grievance and arbitration remedies contained in a collective bargaining agreement prior to filing suit under the LMRA." Martinez v. Int'l. Broth. of Elec. Workers-IBEW Local Union No. 98, 352 F. App'x. 737, 739-40 (3d Cir. 2013) (citing, *e.g.*, Anjelino v. New York Times Co., 200 F.3d 73, 99 (3d Cir. 1999)). Consequently, unexhausted claims must be dismissed unless the plaintiff can demonstrate a "valid reason" for the lack of exhaustion. Anjelino, 200 F.3d at 99 (citing Pawlak v. Greenawalt, 628 F.2d 826, 830-31 (3d Cir. 1980)).

Here, it is undisputed that Dr. Obotetukudo properly exhausted his wrongful termination claim by filing a grievance and pursuing it to arbitration. (Id. ¶¶ 32-33.) At the time that he filed his complaint in this action, an arbitration hearing had been held but a decision was still pending. Defendants have now submitted documents indicating that the arbitrator issued a written Arbitration Award denying Dr. Obotetukudo's grievance on July 1, 2013. (ECF No. 23 Ex. A.)

"[J]udicial review of a labor-arbitration pursuant to a collective bargaining agreement is very limited." Nat'l Ass'n of Letter Carriers, AFL CIO v. U.S. Postal Service, 272 F.3d 182, 185 (3d Cir. 2001) (internal quotations omitted). In general, an arbitrator's award should be upheld unless it "fails to draw its essence from the collective bargaining agreement [because] the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination." United Indus. Workers, Service, Transp., Professional Gov't. of North America of Seafarers' *ex rel*. Bouton v. Gov't of the Virgin Islands, 987 F.2d 162, 170 (3d Cir. 1993); see United Parcel Serv., Inc. v. Intern. Broth. Local No. 430, 55 F.3d 138, 139 (3d Cir. 1995) ("[A]n arbitrator's award will be upheld so long as it draws its essence from the collective bargaining agreement unless the award is tainted by fraud or bias or addresses matters outside the arbitrator's authority.") (internal quotations omitted). Because the arbitrator had not yet rendered a decision at the time that Dr. Obotetukudo initiated this lawsuit, the complaint fails to state any grounds on which that award might be challenged. As such, this claim will be dismissed without prejudice to allow Dr. Obotetukudo an opportunity to amend his complaint to set forth his specific grounds for challenging the arbitrator's award.

### B. Title VII Claims (Counts Two, Three, Six, Eight, and Twelve)

Several counts of Dr. Obotetukudo's complaint assert discrimination claims pursuant to Title VII. In pertinent part, Title VII's antidiscrimination provision provides as follows:

§ 2000e–2. Unlawful employment practices

(a) Employer practices. It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation,

terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). It is undisputed that Clarion University is an "employer" within the meaning of Title VII and that Dr. Obotetukudo is an "employee" entitled to statutory protection. See 42 U.S.C. § 2000e(b), (f). The Third Circuit Court of Appeals, however, has expressly determined that "Congress did not intend to hold individual employees liable under Title VII." Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1077-78 (3d Cir. 1996); see Ugorji v. New Jersey Env. Infrastructure Trust, 529 F. App'x 145, 150 n.2 (3d Cir. 2013) (recognizing that "individual defendants cannot be held liable under Title VII"). Accordingly, only Clarion University is an appropriate defendant with respect to the Title VII claims.

As a threshold matter, the court acknowledges some difficulty in determining the precise nature of the legal claims that Dr. Obotetukudo is attempting to assert under each of the various Title VII counts in his complaint. For example, in Count Three of his complaint he alleges that he was subjected to a hostile work environment because of his outspoken opinions concerning the diversity of the faculty at Clarion University. Counts Eight and Twelve allege that he was discriminated against with respect to promotions and career advancement on account of his race and religious affiliation. Count Nine alleges numerous examples of allegedly retaliatory and harassing conduct. The factual allegations marshalled under each of these counts, however, often overlap and tend to merge into amorphous claims of poor treatment. In order to give Dr. Obotetukudo's allegations their full weight, and mindful that he is proceeding *pro se*, the court

will address all of his retaliation and hostile work environment allegations – wherever they are located – under its discussion of Counts Two and Three. Counts Eight and Twelve will be treated entirely as "disparate treatment" claims. Each of those claims is discussed below.

### 1. Retaliation (Count Two)

In Count Two of his complaint, Dr. Obotetukudo contends that his employment was terminated in retaliation for his outspoken efforts in support of racial diversity at Clarion University. In order to state a First Amendment retaliation claim, Dr. Obotetukudo must allege sufficient factual allegations for this court to infer: (1) his speech or conduct constituted protected activity; (2) defendants responded with retaliation; and (3) his protected speech was the cause of the retaliation. Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997). Speech or conduct is protected under the First Amendment if it involves a matter of public concern and if his interests in the speech outweighed the defendants' interests in "promoting the efficiency of the public services it performs through its employees." Pickering v. Board of Education, 391 U.S. 563, 568 (1968). The United States Supreme Court has recently instructed that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S.Ct. 2517, 2533 (2013).

In support of this claim, Dr. Obotetukudo alleges that he engaged in several specific activities designed to draw attention to the lack of racial diversity at Clarion University including hosting a series of conferences for minority scholars between 1997 and 1999 and organizing a meeting of academic deans in 2001. He contends that defendants responded to his efforts by

labeling him a "rabble rouser" and taking steps to "punish him for speaking so boldly about the perceived or real discriminatory climate prevalent at Clarion University." (ECF No. 4 ¶ 49.) The first of these steps was the initiation of an interim evaluation process designed to provide defendants with an opportunity to formally disparage and denigrate Dr. Obotetukudo's job performance in order to dissuade him from his social advocacy.[4]  Dr. Obotetukudo contends that these interim evaluations became more and more negative in tone over the years, ultimately prompting him to file a discrimination charge with the EEOC sometime in 2010.[5]  Thereafter, at a meeting on August 30, 2011, Dr. Whitney allegedly directed him to "move on."  (ECF No. 4 ¶ 65.)  Dr. Obotetukudo interpreted this to mean that he would be terminated if he refused to withdraw his EEOC complaint.  (Id.)  He also states that an unnamed defendant "threatened [him] with employment termination if [he] refused to release [Clarion University] from charges" with the EEOC.[6]  (Id.)  Finally, he maintains that Clarion University denied his request for sabbatical leave in retaliation for his protected speech and the EEOC filing.  (Id. ¶¶ 68, 120.)

Although these allegations paint a compelling picture in broad brush, careful scrutiny of his complaint reveals that Dr. Obotetukudo largely failed to bolster his conclusory allegations with specific factual averments.  For example, he failed to supply the date on which he filed his EEOC charge, the subject matter of that charge, the name of the individual who allegedly threatened him with termination in response to that charge, the dates on which he requested and was denied sabbatical leave, the details of the interim evaluation process, and the factual circumstances surrounding his termination in December 2011.  The paucity of Dr. Obotetukudo's allegations is particularly acute in light of his admission that his termination may also have been

---

[4] Although it is not entirely clear from the complaint, the implication is that this interim evaluation process may only have applied to Dr. Obotetukudo.

[5] The specific details of his EEOC claims do not appear in the complaint.

[6] The complaint does not indicate whether this is an independent allegation or a reiteration of his perception of the meeting with Dr. Whitney.

motivated by an improper interaction with a student. (Id. ¶¶ 29, 92.) Indeed, given the enhanced causation standard recognized by the Supreme Court's decision in Nassar, the absence of this information is critical.

In sum, the court concludes that Dr. Obotetukudo's allegations lack the requisite level of detail and specificity for the court to conclude he has a plausible claim for retaliation. This claim will be dismissed without prejudice in order to permit Dr. Obotetukudo an opportunity to supply the missing details described above by way of an amended complaint.


## 2. Hostile Work Environment (Count Three)

The *prima facia* elements of a hostile work environment claim under Title VII, Dr. Obotetukudo are: (1) the plaintiff suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe and persuasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of *respondeat superior* liability. Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997). The alleged harassment must be so pervasive or severe as to "alter the conditions of . . . employment and create an abusive working environment." Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 67 (1986). In determining whether this standard is met, courts look to the totality of the circumstances including the frequency of the discriminatory conduct, its severity, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance. Id.

In the instant complaint, Dr. Obotetukudo cites several examples of conduct that he viewed as harassment. For example, he alleges that defendants embedded intentionally disruptive students in his classes, stole his grade book in order to prevent him from satisfying his

job responsibilities, denied him sabbatical leave that he was otherwise entitled to, and fabricated negative and damaging interim reports concerning his job performance. He also alleges that an unnamed individual advised him to return to his "ancestral home" in order to better advocate for the changes he desired. (ECF No. 4 ¶ 144.) Finally, he alleges that two of the individual defendants, McCauliff and Kuehn, suggested that he seek employment in an "inner city" or "traditionally black college [or] university" where his services "would be most appreciated" and where he could be "equally remunerated for [his] intelligence and ambitions." (Id. ¶ 145.)

As an initial matter, the court notes that Dr. Obotetukudo largely failed to connect the majority of these incidents to his membership in a protected class. His own complaint indicates that these incidents were primarily intended to punish him for his "rabble rousing," his "outspoken and confrontational" manner, and his "outspokenness in matters of equity and fairness in the academic community" – rather than his race. (ECF No. 4 ¶¶ 49, 52, 69.)

The incidents that Dr. Obotetukudo does directly attribute to his race – in particular, the comments about returning to his "ancestral home" and seeking employment in the "inner city" – lack temporal connections making it impossible for the court to infer "severe or pervasive" conduct that is actionable under Title VII. Bonenberger, 132 F.3d at 25. As explained by the Supreme Court, "offhand comments and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988). Courts have consistently applied this rule to reject hostile environment claims based on a handful of racially charged allegations. See, e.g., Page v. City of Pittsburgh, 114 F. App'x 52, 54 (3d Cir. 2004) (finding no hostile work environment where the "allegations of discrimination were limited to a series of isolated instances"); King v. City of Phila., 66 F. App'x 300, 305 (3d Cir. 2003) (concluding that a single racial epithet followed by a physical altercation

and the threat of sabotage to plaintiff's work record did not demonstrate a pervasive atmosphere of harassment); Deans v. Kennedy House, Inc., No. 11-7125, 2014 WL 715583, at * 14 (E.D. Pa. Feb. 25, 2014) (occasional derogatory comments from the defendants, coupled with heightened scrutiny of the plaintiff's job performance and various disciplinary actions, did not create a hostile working environment); Eric v. Donsco Inc., No. 09-1052, 2010 WL 5018574, at *6 (M.D. Pa. Oct. 12, 2010) (allegation that the defendants called the plaintiff a "black monkey," stole his lunch, broke his radio, and tampered with his lock were "isolated events" that did not rise to the level of a Title VII violation). Dr. Obotetukudo failed to supply critical details such as the approximate date on which any of the alleged incidents occurred and, in most cases, the identity of the offending individual or individuals. Consequently, his allegations fall short of the level of pervasive and severe conduct necessary for this court to conclude he has a plausible claim for a hostile work environment under Title VII.

### 3. Sex Discrimination (Count Six)

In Count Six of his complaint, Dr. Obotetukudo contends that Clarion University discriminated against him on the basis of his gender in violation of Title VII and Title IX. His burden under both of these statutes is the same: he must allege sufficient facts for the court to infer that he suffered an adverse employment decision because of his gender. See Toth, 844 F.Supp.2d at 639-40. In the instant case, Dr. Obotetukudo primarily relies on the fact that the university president, a former dean, and the chair of his academic department are each female and that he was replaced by a female following his termination. (ECF No. 4 ¶¶ 91-92.) At this stage in the proceedings, these allegations are sufficient to raise a plausible inference of gender-based discrimination. See, e.g., Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355-56 (3d Cir.

1999) (noting that replacement by a person of the opposite gender may raise an inference of discrimination); <u>Kargbo v. Phila. Corp. for Aging</u>, Civil Action No. 13-1216, 2014 WL 1632193, at *8 (E.D. Pa. Apr. 22, 2014) (same); <u>Bielich v. Johnson & Johnson, Inc</u>., Civil Action No. 11-1635, 2014 WL 1117939, at *14 (W.D. Pa. Mar. 20, 2014) (same); <u>Williamson v. Penn Millers Ins. Co</u>., No. 3:04CV1142, 2005 WL 3440633, at *6 (M.D. Pa. Dec. 14, 2005) (concluding that the plaintiff had raised an inference of discrimination by alleging that they were replaced by a person outside of the protected class). Clarion University's motion to dismiss will be denied as to this claim.

### 4. Religious Discrimination (Count Eight)

In order to state a *prima facie* case of Title VII discrimination based upon his religion, Dr. Obotetukudo must set forth sufficient factual allegations for this court to infer: (1) he is a member of a protected class; (2) he suffered some form of adverse employment action; and (3) nonmembers of the protected class were differently treated. <u>Abramson v. William Paterson Coll. of N.J.</u>, 260 F.3d 265, 281-82 (3d Cir. 2001) (setting forth the elements of a "disparate treatment" theory of religious discrimination). To this end, Dr. Obotetukudo alleges that he was repeatedly invited to attend religious services by Dr. Prioleau and was harassed and intimidated in unspecified ways when he declined. (ECF No. 4 ¶ 102.) He accuses defendants of collectively "implanting" Muslim and Christian students in his classes in order to "gauge [his] religiousness." (Id. ¶ 105.) He contends that this activity negatively impacted his career advancement, although he does not explain how. (Id. ¶ 101.)

Dr. Obotetukudo's conclusory allegations fall well short of the level of detail required to state a discrimination claim. For example, Dr. Obotetukudo failed to indicate the nature of his own religious affiliation (or lack thereof) in order to establish membership in a protected class,

the specific details of how he was harassed and intimidated on account of those religious views, or any adverse employment action stemming from his refusal to attend religious services or from the presence of Christian and Muslim students in his classes. Accordingly, this claim will be dismissed without prejudice.

### 5. Racial Discrimination (Count Twelve)

The same test applies to Dr. Obotetukudo's Title VII claim of racial discrimination as to his religious discrimination claim. See, e.g., Roebuck v. Drexel Univ., 852 F.2d 715, 726 (3d Cir. 1988). It is undisputed that Dr. Obotetukudo, a naturalized citizen of Nigerian origin, is a member of a protected class. At the time that he was hired by Clarion University, he was one of only four faculty members of African descent. (ECF No. 4 ¶ 142.) He generally alleges that the university maintained a policy of "denying American black and African black professors in its employ comparable academic ranks and statuses to non-blacks and whites" and that he was never promoted from assistant professor to full professor despite that "his contemporaries have all been promoted to full professors, deans, assistant and associate deans in various universities across the United States." (Id. ¶¶ 55, 143.)[7] He fails to provide a single specific example of a situation where a non-protected class member was treated more favorably than a person of his protected class or any evidence, direct or inferential, of racial disparity within the university's faculty.[8] Indeed, a thorough review of his complaint reveals that Dr. Obotetukudo largely attributed his own lack of career advancement to his outspoken nature and his "habitual negative performance

---

[7] Needless to say, his colleagues' promotions at other universities are irrelevant to his allegations of discrimination against Clarion University.

[8] The only specific incident cited in his complaint – his own termination – resulted in Dr. Obotetukudo being replaced by an African-American. Although the Third Circuit Court of Appeals has held that a discrimination claim cannot be defeated simply because a member of a protected class was replaced by another protected class member, see, eg., Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352-57 (3d Cir. 1999), it is axiomatic that his replacement by a member of the same protected class offers no support for his contention that individuals outside of the protected class were more favorably treated.

evaluations." (Id. ¶¶ 49, 55.) Given the complete lack of specificity with respect to his racial discrimination claim, dismissal without prejudice is warranted.

### C. Section 1983 Due Process Claims (Counts Four, Five and Eleven)

Section 1983 imposes civil liability upon any person who, under color of state law, deprives someone of the rights, privileges, or immunities secured by the federal Constitution or the laws of the United States. Gruenke v. Seip, 225 F.3d 290, 298 (3d Cir. 2000). Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989). To state a claim under § 1983, Dr. Obotetukudo must set forth sufficient factual allegations to permit this court to infer that there was a deprivation of a right secured by the Constitution or laws of the United States and that the deprivation occurred under color of state law. Lugar v. Edmondson Oil Co., Inc., 457 U.S. 922, 931 (1982).

Although not clearly articulated, Dr. Obotetukudo appears to argue in Counts Four, Five and Eleven that defendants deprived him of his property interest in his job as an assistant professor in violation of his Fourteenth Amendment right to due process. Specifically, Count Four alleges that Dr. Gant, the individual charged with investigating the allegations of impropriety leveled against Dr. Obotetukudo by a female student, failed to conduct her investigation in a fair and thorough manner. In Count Five, Dr. Obotetukudo generally accuses defendants of treating him poorly and inconsiderately in the course of terminating his employment. Finally, Count Eleven contains broad and conclusory allegations that defendants violated the CBA in additional unspecified ways.

As an initial matter, Dr. Obotetukudo's § 1983 claims against Clarion University are barred by the immunity afforded to states and state agencies by the Eleventh Amendment. See U.S. Const. Amend. XI ("The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Quern v. Jordan, 440 U.S. 332, 342-45 (1979) (holding that Congress did not intend by the general language of § 1983 to override the traditional sovereign immunity afforded to the states). Courts have consistently extended Eleventh Amendment immunity to the Pennsylvania State System for Higher Education and its fourteen component universities, including Clarion University. See, e.g., Skehan v. State Sys. of Higher Educ., 815 F.2d 244, 247-49 (3d Cir. 1987) (holding that the State System for Higher Education was entitled to Eleventh Amendment immunity); O'Hara v. Indiana Univ. of Pennsylvania, 171 F.Supp.2d 490, 495-98 (W.D. Pa. 2001) (holding that each of the "fourteen component universities" of the State System enjoyed Eleventh Amendment immunity); Toth, 844 F.Supp.2d at 648 (reaching the same conclusion with respect to California University of Pennsylvania, another of the fourteen component universities in the State System).

"Where a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, . . . those procedures satisfy due process requirements 'even if the hearing conducted by the Employer . . . [was] inherently biased.'" Dukes v. Se. Pa. Transp. Auth., 68 F.3d 1564, 1571 (3d Cir. 1995) (quoting Jackson v. Temple Univ., 721 F.2d 931 (3d Cir. 1983)). Here, the complaint clearly indicates that Clarion University provided a grievance and arbitration procedure and that Dr. Obotetukudo took advantage of that procedure by filing a grievance after his discharge and pursuing it to arbitration. He does not allege that the grievance procedures themselves violated due process or that the arbitration proceedings or the

19

arbitrator were biased in any way.  See, e.g., Jackson, 721 F.2d at 933.  As such, Dr.

Obotetukudo "received all of the process to which he was entitled under the collective bargaining

agreement and therefore his rights to due process were not violated."  Poli v. SEPTA, No. 97-

6766, 1998 WL 405052, at *9 (E.D. Pa. July 7, 1998).  Each of these claims must be dismissed.


### D.  ADEA Claim (Count Seven)

The ADEA makes it unlawful for an employer, including a State, "to fail or refuse to hire

or to discharge any individual or otherwise discriminate against any individual . . . because of

such individual's age." 29 U.S.C. § 623(a)(1); Kimel v. Florida Bd. of Regents, 528 U.S. 62, 91

(2000).  Although his complaint alleges a violation of the ADEA, Dr. Obotetukudo failed to state

his age or plead any facts suggesting that his age played a factor in his termination.  In fact, a

careful review of the complaint actually supports the opposite inference.  For example, Dr.

Obotetukudo explicitly states that "[s]everal faculty members . . . far older than plaintiff continue

to teach" at Clarion University.  (ECF No. 4 ¶ 100.)  He admits that defendants only referenced

his age as "a smokescreen" to cover up the fact that they really wanted to eliminate him because

of his outspokenness.  (Id. ¶ 100.)  In any event, ADEA claims against states or state agencies are

precluded by the Eleventh Amendment, see Kimel, 528 U.S. at 90-91, and the ADEA does not

provide for individual liability.  See Hill v. Borough of Kutztown, 455 F.3d 225, 246 n. 29 (3d

Cir. 2006).  Dr. Obotetukudo's ADEA claim will be dismissed with prejudice.


### E.  Remaining Federal Claims (Counts Nine, Ten and Thirteen)

Dr. Obotetukudo asserts several additional claims that either fail to invoke any particular

statute or constitutional provision or are clearly duplicative of his other allegations.  For

example, although Count Nine ("Violation of Constitutional Rights") contains facts that support his retaliation claim at Count Two, Dr. Obotetukudo fails to identify any non-duplicative legal basis to support Count Nine as an independent ground for relief. While Count Ten purports to allege a "Conspiracy to Violate Federal Civil Rights," the factual averments detailed in that section of the complaint focus entirely on the various indignities Dr. Obotetukudo suffered following his termination, rather than the existence of any of the elements of a civil conspiracy. (ECF No. 4 ¶¶ 132-38.) Finally, Count Thirteen of the complaint – styled "Conflicts of Interest and Premeditated Acts" – completely fails to identify any recognizable cause of action. (Id. ¶¶ 139-60.) Consequently, Counts Nine, Ten and Thirteen of the complaint will be dismissed as independent claims. To the extent that the factual allegations set forth in those portions of the complaint support any of Dr. Obotetukudo's other discrimination claims, the court factored those allegations into its analysis.

### F. Intentional Infliction of Emotional Distress (Count Fourteen)

Count Fourteen of Dr. Obotetukudo's complaint raises a state-law claim for intentional infliction of emotional distress. In order to prevail on this claim, Dr. Obotetukudo would have to demonstrate that one or more of defendants "by extreme and outrageous conduct . . . intentionally or recklessly caused the plaintiff severe emotional distress." Hackney v. Woodring, 622 A.2d 286, 288 (Pa. Super.Ct. 1993). The level of conduct required "'must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.'" Cox v. Keystone Carbon Co., 861 F.2d 390, 395 (3d Cir. 1988) (quoting Buczek v. First Nat'l Bank of Mifflintown, 531 A.2d 1122, 1125 (Pa. Super.Ct. 1987)). Plaintiff must also allege that he has suffered "some

type of resulting physical harm because of the defendants' outrageous conduct." Kane v. Chester Cty. Dept. of Children, Youth and Families, Civil Action No. 12-cv-6649, 2014 WL 1302101, at *15 (E.D. Pa. Mar. 31, 2014).

As previously discussed, Clarion University, one of the fourteen constituent universities in the Pennsylvania higher education system, is "entitled to the protection of the Eleventh Amendment in this court." O'Hara, 171 F.Supp.2d at 498. This immunity extends to pendent state law claims. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120-21 (1984) (holding that "the Eleventh Amendment should not be construed to apply with less force to [pendant claims] than it does to the explicitly granted power to hear federal claims."). Consequently, this court may not exercise supplemental jurisdiction over Dr. Obotetukudo's state law claim against Clarion University. See, e.g., Reiff v. Phila. County Court of Common Pleas, 827 F.Supp. 319, 324 (E.D. Pa. 1993) (dismissing state law claims without prejudice after noting that "neither pendant jurisdiction nor any other basis for jurisdiction may override the Eleventh Amendment").

Dr. Obotetukudo's state law claim against the individual defendants is similarly barred. Pennsylvania law generally provides that the state and its "officials and employees acting within the scope of their duties" enjoy "sovereign immunity and official immunity and remain immune from suit." 1 PA. CONS. STAT. § 2310. "To be immune, a party must be the Commonwealth, or an official or employee thereof, and must have been acting within the scope of its duties." Ismael v. Ali, No. 99-1932, 2007 WL 336286, at *2 (W.D. Pa. Jan. 31, 2007). An employee acts within the scope of his employment if his conduct: "(1) is the kind the employee is employed to perform; (2) occurs substantially within the authorized time and space limits; and (3) is actuated,

at least in part, by a purpose to serve the master." Id. at *2 (citing Brumfield v. Sanders, 232 F.3d 376, 380 (3d Cir. 2000)).

In the instant case, Dr. Obotetukudo alleges that defendants "conspire[ed] to deprive plaintiff of his civic and constitutional rights" through their "reckless violation of the provisions of the mutually entered into [CBA]" and their "decision to terminate plaintiff's eighteen year tenured employment." (ECF No. 4 ¶¶ 161-62.) The decision to terminate an employee and the evaluative process supporting that decision are clearly within the scope of the individual defendants' responsibilities as administrators of Clarion University. See, e.g., Kull v. Guisse, 81 A.3d 148, 157-59 (Pa. Commw. Ct. 2013) (university administrators' alleged failure to comply with Kutztown University's "tenure evaluation policies and procedures" in the course of denying tenure were within the scope of their employment); Aina v. Howard-Vital, No. 13-2702, 2013 WL 5567798, at *6 (E.D. Pa. Oct. 9, 2013) (university officials' allegedly defamatory statements at a disciplinary meeting were within the scope of their employment); Ismael, 2007 WL 336286, at *3. As such, the individual defendants are immune from Dr. Obotetukudo's allegations of tortious conduct based on that decision.

In any event, "it is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." Andrews v. City of Phila., 895 F.2d 1469, 1486 (3d Cir. 1990). Indeed, "[c]ourts have consistently held that claims based on termination of an employment relationship will not satisfy the outrageous conduct requirement of the torts of negligent or intentional infliction of emotional distress." Galezniak v. Millville Health Ctr., No. 11-1719, 2012 WL 140220, at *3 (M.D. Pa. Jan 18, 2012); see Cox, 861 F.2d at 395 (finding that "the only instances in which courts applying Pennsylvania law have found outrageous conduct in the

employment context is where an employer engaged in both sexual harassment and other retaliatory behavior against an employee"); Fleming v. Kramont Emp'r Royce Realty, Inc., No. 02-2703, 2002 WL 1964257, at *5 (E.D. Pa. Aug. 16, 2002) (holding that allegations of retaliation and a hostile work environment based upon race and sex could not rise to the level of outrageousness required for intentional infliction of emotional distress). Dr. Obotetukudo's allegations fall short of the level of outrageous conduct required for this court to refer he has a plausible claim for intentional infliction of emotional distress.[9] See, e.g., Cox, 861 F.2d at 390 (holding that an employer's ill-motivated or callous termination of the plaintiff's employment was insufficient to state a claim for intentional infliction of emotional distress).

### G. Leave to Amend

The Third Circuit Court of Appeals has instructed that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." Phillips v. County of Allegheny, 515 F.3d 224, 236 (3d Cir. 2008). An amendment is futile if the amended complaint cannot withstand a renewed motion to dismiss. Shane v. Fauver, 213 F.3d 113, 116 (3d Cir. 2000).

In the instant case, amendment would be clearly futile as to Dr. Obotetukudo's due process claims (Counts Four, Five and Eleven), his ADEA claim (Count Seven), his intentional

_____

[9] As yet another basis for dismissal, the court notes that § 301 of the LMRA completely preempts state-law causes of action based on the violation of a collective bargaining agreement. See Teamsters v. Lucas Flour Co., 369 U.S. 95, 103 (1962). Because each of the allegations raised in support of Dr. Obotetukudo's intentional infliction of emotional distress claim is based on his contention that defendants ignored or violated the CBA in the course of securing his termination, those claims are preempted by the LMRA. See, e.g., Capraro v. United Parcel Service Co., 993 F.2d 328, 333 (3d Cir. 1993) (dismissing an intentional infliction of emotional distress claim on preemption grounds because it required the court to consider whether the defendants had the right to terminate the plaintiff under a CBA); Shanefelter v. U.S. Steel Corp., 784 F.Supp.2d 550, 562-63 (W.D. Pa. 2011) (determining that a claim for intentional infliction of emotional distress was preempted by the LMRA because the claim "was necessarily grounded in whether defendants' actions were proper under the terms of" a collective bargaining agreement).

infliction of emotional distress claim (Count Fourteen), and the amorphous claims set forth in Counts Nine, Ten and Thirteen. Each of those claims suffers from legal defects that cannot be cured by amendment. Leave to amend will be granted, however, with respect to Dr. Obotetukudo's wrongful termination claim (Count One) and his Title VII claims against Clarion University alleging retaliation, a hostile work environment, and gender, religious, and racial discrimination (Counts Two, Three, Six, Seven, and Twelve).

## V.     Conclusion

For the reasons set forth above, defendants' motion to dismiss is granted in part and denied in part. With respect to Count Four (Due Process), Count Five (Abuse of Process), Count Seven (Age Discrimination), Count Nine (Civil Rights), Count Ten (Conspiracy), Count Eleven (Due Process), Count Thirteen (Conflicts of Interest), and Count Fourteen (Intentional Infliction of Emotional Distress), those claims are dismissed *with prejudice* as to all defendants.

With respect to Count One (Wrongful Termination), Count Two (Retaliation), Count Three (Hostile Work Environment), Count Eight (Religious Discrimination), and Count Twelve (Racial Discrimination), those claims are dismissed *with prejudice* as to the individual defendants and *without prejudice* as to defendant Clarion University.

With respect to Count Six (Sex Discrimination), the motion to dismiss is GRANTED as to the individual defendants and DENIED as to Clarion University. Count III is dismissed *with prejudice* as to each of the individual defendants.

Plaintiff may file an amended complaint within 30 days of this order. In so doing, Plaintiff may attempt to remedy the factual deficiencies in his original complaint with respect to Counts One, Two, Three, Eight and Twelve against Clarion University.

An appropriate order follows.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
Chief United States District Judge

Dated:  August 6, 2014