**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DR. SOLOMON WILLIAMS | ) | |
| OBOTETUKUDO, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 13-0639 |
| | ) | |
| CLARION UNIVERSITY of PENNSYLVANIA, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

**Conti, Chief District Judge**

### I.    Introduction

This matter is before the court upon a motion to dismiss (ECF No. 40) filed on behalf of

defendant Clarion University of Pennsylvania ("Clarion University").    This court has

jurisdiction pursuant to 28 U.S.C. § 1331.    For the reasons set forth below, the motion to

dismiss will be granted in part and denied in part.

### II.    Factual Background

As Plaintiff is proceeding *pro se,* the factual allegations in his complaint are to be

construed liberally.[1]    Erickson v. Pardus*, 551 U.S. 89, 94 (2007).    The plaintiff, Dr. Solomon

Williams Obotetukudo ("Dr. Obotetukudo" or "Plaintiff"), is a naturalized citizen of Nigerian

ancestry.    (ECF No. 39 ¶ 1.)    From 1994 through 2011, Dr. Obotetukudo was employed as an

---

[1] Although the standard used to evaluate a motion to dismiss in a *pro se* action is a liberal one, the court must still endeavor to separate "pleadings that . . . are no more than conclusions" from "well-pleaded factual allegations" that are entitled to a presumption of veracity.  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).  The court need not accept as true those allegations which are clearly "fanciful," "fantastic," or "delusional."  Denton v. Hernandez, 504 U.S. 25, 33 (1992) (quoting Neitzke v. Williams, 490 U.S. 319, 327 (1989)); see also, e.g., Pavalone v. Bush, No. 11-620, 2012 WL 1569614, at *1 (M.D. Pa. Mar. 27, 2012) ( "Within the Third Circuit, courts have found that allegations which are considered fanciful, fantastic, and delusional are to be dismissed as frivolous.").

assistant professor of speech communication and theatre at Clarion University, one of the fourteen academic universities comprising the Pennsylvania State System of Higher Education ("PASSHE"). (Id. ¶¶ 3, 8, 19.) Dr. Obotetukudo earned tenure at the university in 1999. (Id. ¶ 5.)

Throughout his employment at Clarion University, Dr. Obotetukudo was a staunch advocate for increased hiring and retention of minority faculty members. For example, Dr. Obotetukudo hosted an "All-Minority Scholars Conference" in the spring of 2000 to provide minority faculty from around the country with an opportunity to present scholarly papers. (Id. ¶ 27.) In March 2001, Dr. Obotetukudo organized a meeting of Clarion University's academic deans to highlight options the university could consider to increase the diversity of the tenured staff. (Id. ¶ 34.) Dr. Obotetukudo contends that officials at Clarion University viewed these activities as "confrontational" and "rabble rousing" and responded by subjecting Dr. Obotetukudo to "negative evaluation and pervasive and intensive scrutiny of everything and anything [he] did in and out of the campus of Clarion University." (Id. ¶¶ 34, 36.)

Dr. Obotetukudo cites a host of discriminatory and retaliatory acts that he believes were intended to punish him for speaking out. For example, Dr. Obotetukudo applied for a promotion from assistant to associate professorship in 2001, 2002, and 2005. (Id. ¶¶ 46, 47, 58.) On each occasion, Clarion University officials denied the requested promotion and refused to meet with Dr. Obotetukudo to discuss their decision. (Id. ¶¶ 46-47, 58-59.) He also contends that the university subjected him to a series of "Interim Performance Evaluations" between October 23, 2001, and May 15, 2011, that were implemented for the sole purpose of impugning his professional achievements and damaging his academic reputation. (Id. ¶¶ 36, 62, 137.) Finally, Dr. Obotetukudo contends that the university denied his request for a

sabbatical leave in 2011 despite his being "highly favored with a fifth place ranking on a list of fifteen (15) applicants." (<u>Id.</u> ¶ 63, 80e, 171, 225.)

In addition to the discrete employment acts described above, Dr. Obotetukudo contends that Clarion University officials routinely engaged in or orchestrated conduct that exposed Dr. Obotetukudo to retaliation and a hostile working environment. These activities include the following:

- On April 18, 2009, the Dean of the College of Arts and Sciences at Clarion University stated to Dr. Obotetukudo: "You are a disgrace to your ethnicity, race, yourself, the University and the Department. You are a liar. Sol you are lying. I am going to recommend to the University that you be terminated. I was a Speech Communications professor for twenty-five years. You are not teaching the students theory. The students are not learning anything from you." (<u>Id.</u> ¶ 209.)

- Throughout the fall of 2011, Clarion University embedded students in Dr. Obotetukudo's classes who were "hired, paid, and subsidized as student spies to snoop, sneak, [and] spy around" in order to harass and intimidate him and disrupt his classes. (<u>Id.</u> ¶¶ 212-13, 215-16.) These students acted as informants and "secret agents" for the university's administration in order to turn "a learning environment . . . into a snooping theatre of the absurd and non-dignifying, and an investigatory Gestapo." (<u>Id.</u> ¶ 216.)

- Dr. Andrew Lingwall, an associate professor in Dr. Obotetukudo's department, once wrote a bad evaluation of Dr. Obotetukudo and refused to shake his hand or discuss the evaluation with him. (<u>Id.</u> ¶ 217.)

- On April 28, 2008, Dr. Scott Keuhn, another professor in the Department of Communications, stated: "Sol, you are as short as ape. Is that how short people from your part of Nigeria are?" (<u>Id.</u> ¶ 218.)

- On March 29, 2009, someone broke into Dr. Obotetukudo's office and stole his grade book. (<u>Id.</u> ¶ 221.)

- Dr. Obotetukudo's office did not have a functioning heating system for approximately three months during the fall of 2011 despite his repeated requests to have it repaired. (<u>Id.</u> ¶ 223.)

- Dr. Obotetukudo's office telephone did not work throughout portions of the 2011 academic year. (<u>Id.</u> ¶ 226.) Dr. Obotetukudo suggests that Clarion University delayed repairing his phone to create an impression that he was professionally irresponsible and perpetuate the notion that he "does not know how to operate the phone system on his desk because of his ethnicity." (<u>Id.</u>)

- Dr. Obotetukudo contends that he "had more computer breakdowns and malfunctions than any other faculty in the history of Clarion University." (<u>Id.</u> ¶ 228.)

- During the summer of 2009, Clarion University embedded "five female faculty members" in a computer training session with Dr. Obotetukudo in order to "fraternize" with him for the purpose of trying to induce him into acting "improperly" towards them. (<u>Id.</u> ¶ 230.) Dr. Obotetukudo also generally alleges that Clarion University "coordinated activities of women in Clarion" for the purpose of inducing him into improper behavior that could be used against him. (<u>Id.</u> ¶ 231.)

- In 2009, a female Latin American faculty member informed Dr. Obotetukudo that she had taken her children for a visit to her ancestral home in Latin America and that her children had benefited from the experience. She then suggested that Dr. Obotetukudo might enjoy doing the same with his own children. (Id. ¶ 231.)

- Throughout the summer of 2011, Clarion University engaged "its network of spies and agents" to harass Dr. Obotetukudo and his wife "everywhere along the Eastern seaboard of United States from New York through North Carolina; and into the hinterlands of the United States as far and wide as Colorado, Arizona, Utah, Nebraska, and Iowa, in the form of police profiling, hotel rooms [sic] invasions and searches, telephonic communications interceptions, auto vandalisms, airport harassing routines, intrusive searches, luggage checking and security alerts, and luggage seizures." (Id. ¶ 167.)

- On July 30, 2011, Dr. Obotetukudo's home in Southern California was raided by ten Fontana City police officers in the middle of the night. (Id. ¶ 169.) Dr. Obotetukudo attributes this incident to agents of Clarion University acting "in cahoots with the Mayor of Fontana, and the Fontana Chief of Police." (Id.)

- Officials at Clarion University embedded "Christian and Muslim students" in Dr. Obotetukudo's classes to gauge his religiousness and report back to the administration concerning the content of his courses. (Id. ¶¶ 247, 250.) Clarion University also implanted "wives and daughters of preachers and pastors" in his classes because he was seen as "a conveyor of satanic phrases and a proselytizer of satanic order" by the university's administration. (Id. ¶ 251.)

- On or about December 23, 2011, while staying at a Best Western hotel in San Francisco to celebrate his son's birthday, Dr. Obotetukudo contends that his family was suddenly surrounded by "a coterie of persons . . . from Grove City College, and the University of Pittsburgh with Steelers T-Shirts, and specific identification accessories" indicating that they were from Pennsylvania.[2] (Id. ¶ 83.) Dr. Obotetukudo contends that these individuals made "deliberate and conscious efforts to ensure Plaintiff knew who they were and from where they came," including "signs of hostility and intimidation or gloating, directed at the Plaintiff and his family." (Id.) He contends that they were acting at the direction of Clarion University "in a show of solidarity to the State and specific universities in the region, like Duquesne University [the Alma Mater to the Clarion University Chief of Public Safety and Campus Security], and Grove City College," and to "monitor Plaintiff's movements across the United States" and "impeach Plaintiff's credibility as a married family man." (Id.)

In August 2010, Dr. Obotetukudo filed discrimination charges with the Equal Employment Opportunity Commission ("EEOC") against Clarion University with respect to the hostile working conditions described above and the unfair interim performance evaluations.[3] (Id. ¶ 146.) In retaliation for those charges, Dr. Obotetukudo contends that Clarion University set in motion a plan to find a pretext for his termination. (Id. ¶ 151.)

On October 29, 2011, Dr. Obotetukudo administered a quiz in one of his classes. (Id. ¶ 63b.) A female student asked him for "some answers on the quiz," to which he responded,

---

[2] As an aside, the court notes that the Pittsburgh Steelers played the San Francisco 49ers in San Francisco on December 19, 2011.
[3] The amended complaint contains two different dates for the filing of this charge with the EEOC: August 15, 2010 (Am. Compl. ¶ 146), and August 30, 2010 (id. ¶ 118).

"You are bright, intelligent, beautiful, and an ambitious girl. You have a lot to offer. You can do it [the quiz] by yourself. I like you to succeed." (Id.) Later that day, the student "stalked" him around campus and inquired about his weekend plans. (Id.) After learning that the student would be visiting friends at Penn State University that weekend, Dr. Obotetukudo advised her, "Be careful at Penn State University. It is a bigger campus. Take care of yourself." (Id.) He also requested that the student "[r]emember to tell your advisors the context in which I told you, 'You are a beautiful girl,' else they will say I am harassing you." (Id.).

On November 17, 2011, Dr. Obotetukudo sent that same student an email noting her absentmindedness and nonengagement in class and offering "words of consolation" to improve her mood. (Id. ¶ 63f.) On November 30, 2011, the student showed up in class without a topic selected for a speech. (Id. ¶ 63j.) After struggling to find a topic, the student walked out of the classroom and slammed the door. (Id.)

On December 1, 2011, that student and a friend met with Dr. Myrna Kuehn, the Chair of the Department of Communications, and alleged that "Dr. O hit on me." (Id. ¶ 63k.) The following day, December 2, 2011, the student returned to Dr. Obotetukudo's class, but refused to apologize for slamming the door on November 30. (Id. ¶ 63*l*.) After class, she returned to Dr. Kuehn and explained that Dr. Obotetukudo had said "I like you more than that" in response to her telling him that he was a good professor. (Id.) Dr. Obotetukudo contends that this exchange never took place. (Id.)

On December 7, 2011, Dr. Obotetukudo received notice that the female student in question had filed a harassment complaint against him. (Id. ¶ 63o.) The following day, Dr. Obotetukudo met with Dr. Jocelind Gant, the Vice President for Social Equity and Special Assistant to the President, to discuss the allegation. (Id. ¶ 63q.) Dr. Obotetukudo responded to

the allegation in writing on December 12, 2011.  (Id. ¶ 63r.)  On December 16, 2011, Dr. Obotetukudo met with Clarion University President Karen Whitney and other members of the university's administration to discuss his interaction with the student in question.  (Id. ¶ 63t.) On December 22, 2011, Dr. Obotetukudo received a letter from President Whitney informing him that he had been terminated for "violating University policy on interactions with students and staff."  (Id. ¶ 63v.)

On February 7, 2012, Dr. Obotetukudo filed a charge with the EEOC alleging discrimination and retaliation based on his race, sex, religion, age, and national origin.  (ECF No. 40-1 at 2.)[4]  In his EEOC filing, Dr. Obotetukudo alleged that Clarion University had subjected him to "years of a hostile environment of harassment."  (Id.)  He listed several specific incidents that he claimed were retaliatory, including the denial of his request for sabbatical and his termination.  (Id.)

Dr. Obotetukudo also challenged his termination by filing a grievance alleging that Clarion University had failed to establish just cause for his termination as required by the university's Collective Bargaining Agreement ("CBA").  (ECF No. 40-1 at 5.)  The grievance was ultimately pursued to arbitration and denied following a hearing.[5]  (Id. at 22.)

---

[4] Although Dr. Obotetukudo did not attach the EEOC charge to his complaint, Clarion University attached it as an exhibit to its motion to dismiss.  (ECF No. 40-1.)  Dr. Obotetukudo attached the same document to his brief in response to the motion to dismiss.  (ECF No. 45-2.)  The court may consider this undisputedly authentic document in deciding this motion without converting it into a motion for summary judgment.  See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993) (holding that "a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document"); Colbert v. Mercy Behavioral Health, 845 F.Supp.2d 633, 637 (W.D. Pa. 2012) (noting that a court may consider an EEOC charge attached to a motion to dismiss without converting the motion into a motion for summary judgment).

[5] As with the EEOC charge, the arbitration award, issued on July 1, 2013, is an undisputedly authentic document that the court may consider without converting the motion to dismiss into a motion for summary judgment.  See, e.g., U.S. Airline Pilots Ass'n v. U.S. Airways, Inc., 25 F.Supp.3d 758, 767 (W.D. Pa. 2014) (holding that an arbitration award referenced heavily in the complaint is "clearly appropriate for consideration in connection with [a] motion to dismiss.").  Both parties attached this document to their briefs in support of and opposition to the motion to dismiss.  (ECF No. 40-1; ECF No. 45-4.)

## III. Procedural History

On May 6, 2013, Dr. Obotetukudo commenced the instant action by filing a 14-count *pro se* complaint challenging the circumstances of his employment and termination as a tenured assistant professor at Clarion University. (ECF No. 4.) The allegations in the original complaint centered on Dr. Obotetukudo's contention that the defendants retaliated against and harassed him on the basis of his race, gender, age, and religion in violation of the First, Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, Title IX of the Educational Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* (Id.) Dr. Obotetukudo also raised several Due Process claims based on alleged violations of the university's CBA and a state law claim for intentional infliction of emotional distress. (Id.) Dr. Obotetukudo named as defendants Clarion University and the following individuals: Dr. Joseph P. Grunenwald, Dr. Karen M. Whitney, Dr. Stanton W. Green, Dr. Valentine U. James, Dr. Ron Nowaczyk, Dr. Stephen A. Johnson, Dr. Rachelle C. Prioleau, Barry L. McCauliff, Dr. Susan M. Hilton, Dr. Myrna F. Kuehn, Dr. Jocelind E. Gant, and Timothy P. Fogarty. (Id.)

The defendants moved to dismiss the original complaint on September 27, 2013. (ECF No. 23.) On August 6, 2014, this court entered a memorandum opinion and order in which the court: (1) dismissed all claims against each of the individual defendants with prejudice; (2) dismissed Dr. Obotetukudo's due process, age discrimination, and intentional infliction of emotional distress claims with prejudice; (3) dismissed Dr. Obotetukudo's wrongful termination and Title VII discrimination claims without prejudice; and (4) denied defendants' motion to dismiss with respect to Dr. Obotetukudo's gender discrimination claim against

Clarion University. (Id. at 25). The court instructed Dr. Obotetukudo that he could attempt to correct the factual deficiencies in his wrongful termination and Title VII discrimination claims by filing an amended complaint. (Id.)

Dr. Obotetukudo filed an amended complaint on September 23, 2014. (ECF No. 39.) This pleading, spanning 176 pages and 328 paragraphs, asserts the following federal and claims pursuant to Title VII and the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. §§ 951-963: wrongful termination (Count One); retaliation (Count Two); hostile work environment (Count Three); gender/sex discrimination (Count Four); religious discrimination (Count Five); and racial discrimination (Count Six). (Id.) Dr. Obotetukudo added state law claims for violations of the Pennsylvania Whistleblower Act, 43 PA. STAT. §§ 1421-1428, (Count Seven) and defamation (Count Eight). (Id.)

Clarion University moved to dismiss the amended complaint on September 30, 2014. (ECF No. 40.) Plaintiff filed a brief in opposition to that motion on November 20, 2014. (ECF No. 45.) The matter is now fully briefed and ripe for review.

**IV. Standard of Review**

A motion to dismiss tests the legal sufficiency of the complaint. Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993). In deciding a motion to dismiss, the court is not opining on whether the plaintiff will be likely to prevail on the merits; rather, when considering a motion to dismiss, the court accepts as true all well-pled factual allegations in the complaint and views them in a light most favorable to the plaintiff. U.S. Express Lines Ltd. v. Higgins, 281 F.3d 383, 388 (3d Cir. 2002). While a complaint does not need detailed factual allegations to survive a Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)") motion to dismiss, a complaint must provide more than labels and conclusions. Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 555 (2007). A "formulaic recitation of the elements of a cause of action will not do." Id. (citing Papasan v. Allain, 478 U.S. 265, 286 (1986)). "Factual allegations must be enough to raise a right to relief above the speculative level" and "sufficient to state a claim for relief that is plausible on its face." Id. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Twombly, 550 U.S. at 556).

> The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully.. . . Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

(Id.) (quoting Twombly, 550 U.S. at 556) (internal citations omitted). Two working principles underlie Twombly. Id. First, with respect to mere conclusory statements, a court need not accept as true all of the allegations contained in a complaint. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555.) Second, to survive a motion to dismiss, a claim must state a plausible claim for relief. Id. at 679. "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. (citing Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d Cir. 2007)). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]—that the pleader is entitled to relief.'" Id. (quoting Fed. Rule Civ. Proc. 8(a)(2)). A court considering a motion to dismiss may begin by identifying pleadings that are not entitled to the assumption of truth because they are mere conclusions.

While legal conclusions can provide the framework of the complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

Id.

## IV.     Discussion

As noted above, Dr. Obotetukudo alleges that Clarion University discriminated and retaliated against him on the basis of his gender, race, and religion.  He also contends that the university subjected him to a hostile work environment and failed to follow the procedures set forth in the CBA in the course of terminating his employment.  Finally, he asserts state law claims for defamation and violations of the Pennsylvania Whistleblower Law.  Each of these claims will be discussed in detail below.

### A.  Wrongful Termination (Count One)

As a faculty member at Clarion University, Dr. Obotetukudo was a member of a union whose relationship with the university was governed by a CBA.  (ECF No. 39 ¶¶ 70, 26.)  The termination procedures embodied in the Clarion University CBA specified that termination must be supported by "just cause."  (Id.)  In Count One of his amended complaint, Dr. Obotetukudo asserts that Clarion University lacked just cause to terminate his employment because the event supporting the termination decision – his improper interaction with a female student – was fabricated by the university as part of a "pattern of recruiting and coaching females and minority students to entrap and ensnare" him.  (Id. ¶¶ 70-78.)

"[J]udicial review of a labor-arbitration pursuant to a collective bargaining agreement is very limited."  Nat'l Ass'n of Letter Carriers, AFL CIO v. U.S. Postal Serv., 272 F.3d 182, 185

(3d Cir. 2001) (internal quotation marks omitted).  A court should not "review the arbitrator's decision on the merits despite allegations that the decision rests on factual errors or misinterprets the parties' agreement."  Major League Baseball Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001).  An arbitrator's award should be upheld unless it "fails to draw its essence from the collective bargaining agreement [because] the arbitrator acted in manifest disregard of the law, or if the record before the arbitrator reveals no support whatsoever for the arbitrator's determination."  United Indus. Workers v. Gov't of V.I., 987 F.2d 162, 170 (3d Cir. 1993); see United Parcel Serv., Inc. v. Int'l Bhd. of Teamsters, Local Union No. 430, 55 F.3d 138, 139 (3d Cir. 1995) ("[A]n arbitrator's award will be upheld so long as it draws its essence from the collective bargaining agreement unless the award is tainted by fraud or bias or addresses matters outside the arbitrator's authority.") (internal quotation marks omitted).  A reviewing court must not act to "correct factual or legal errors made by an arbitrator," and must uphold an award "even if the arbitrator engaged in 'improvident, even silly, factfinding.'"  Ario v. Underwriting Members of Syndicate 53 at Lloyds for 1998 Year of Account, 618 F.3d 277, 296 (3d Cir. 2010) (quoting Major League Umpires Ass'n v. Am. League of Prof'l Baseball Clubs, 357 F.3d 272, 279-80 (3d Cir. 2004)).

In the instant case, the arbitrator concluded that Dr. Obotetukudo's termination was supported by just cause because the evidence of record revealed that Dr. Obotetukudo had engaged with a female student in an inappropriate manner between October 24, 2011, and December 5, 2011.  (ECF No. 40-1 at 11.)  In seeking to overturn this decision, Dr. Obotetukudo primarily contends that the arbitrator erred by accepting the university's version of facts over his own.  (ECF No. 39 ¶¶ 70-73, 77-79.)  Dr. Obotetukudo takes issue with the arbitrator's use of the phrase "sexual harassment" to describe his interactions with the student.

(Id. ¶¶ 88, 90.)  Neither of these contentions forms a valid basis for judicial review of a labor-arbitration award.  See, e.g., Garvey, 532 U.S. at 509 (noting that "allegations that the decision rests on factual errors" will not support judicial review); Major League Umpires Ass'n, 357 F.3d at 279-80 (reviewing court may not act to "correct factual or legal errors made by an arbitrator").

Dr. Obotetukudo suggests that the award should be overturned because it was not issued within thirty days of his arbitration hearing, as requested by the CBA.  (Id. ¶ 92.)  The pertinent provision of the CBA states that "[t]he arbitrator shall be requested to issue his/her decision within thirty (30) calendar days after the hearing or receipt of the transcript of the hearing." (Id.)  Dr. Obotetukudo's arbitration hearing was held on March 14, 2013, and the arbitrator's decision was rendered on July 1, 2013.[6]  (Id.)  Dr. Obotetukudo contends that this delay requires the court to overturn the award.

"An arbitrator's award is not *per se* void because it was rendered outside the time limits stated in the collective bargaining agreement."  N.J. Reg'l Council of Carpenters v. Patock Constr. Co., Civil No. 08-4892, 2009 WL 689629, at *6 (D.N.J. Mar. 11, 2009) (citing Local Union 560, Int'l Bhd. of Teamsters v. Anchor Motor Freight, Inc., 415 F.2d 220, 225-26 (3d Cir. 1969)).  "[I]f the parties intend to provide for the automatic invalidation of a late award they must say so in unequivocal language."  Anchor Motor Freight, 415 F.2d at 226.  Dr. Obotetukudo does not allege that the Clarion University CBA contained such language; indeed, it is not even clear that the CBA's "request" for a decision within 30 days represents a binding requirement.   In any event, in the absence of language providing for the automatic invalidation of a late award, courts have held that an arbitrator's authority extends for a "reasonable time beyond the original fixed period."  Id.  The award in the instant case, issued two-and-a-half

---

[6] The amended complaint does not indicate on what date the arbitrator received the transcript of the hearing.

months outside of the requested 30-day window, falls within this "reasonable" time span. See id. at 222, 224-26 (concluding that an arbitrator's award was rendered within a reasonable time where the award was issued over seven months after expiration of the deadline contemplated by the agreement); United Transp. Union v. CSX Transp., Inc., No. 89-3344, 1990 WL 52381, at *6 (6th Cir. Apr. 26, 1990) (affirming an award issued twenty months beyond the originally fixed period); United Steelworkers of Am., Local 8249 v. Adbill Management Corp., No. 83-87, 1984 WL 73, at *3 (D.V.I. Jan. 25, 1984) (affirming award issued just less than seven months after the hearing). Under these circumstances, the claim for wrongful termination must be dismissed.

## B. Retaliation (Count Two)

In order to establish a *prima facie* case of retaliation under Title VII, a plaintiff must allege that: (1) he engaged in protected activity; (2) his employer took an adverse employment action against him; and (3) there was a causal connection between his participation in the protected activity and the adverse employment action. Moore v. City of Phila., 461 F.3d 331, 340-41 (3d Cir. 2006). The United States Supreme Court has instructed that "Title VII retaliation claims must be proved according to traditional principles of but-for causation," which "requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533 (2013).

In the instant case, Dr. Obotetukudo contends that Clarion University terminated his employment in retaliation for his filing of an EEOC charge in August 2010. Prior to filing that charge, Dr. Obotetukudo had engaged in various activities, primarily between 1997 and 2001, that were designed to draw attention to the lack of racial diversity at Clarion University and in

higher education. (ECF No. 39 ¶¶ 120-23.) He maintains that university officials responded to these efforts by initiating a retaliatory campaign to limit his professional growth and pave the way for his termination.[7] In particular, he alleges that Clarion University subjected him to "a capricious and egregious Interim Evaluation regiment" from 2000 to 2011 for the sole purpose of formally disparaging and denigrating his job performance and justifying adverse employment decisions. (Id. ¶¶ 120, 123-24.) Dr. Obotetukudo contends that these evaluations became more and more malicious in tone over the years, ultimately prompting him to file the August 2010 EEOC charge that allegedly motivated his termination. (Id. ¶ 118.)

It is axiomatic that termination is an adverse employment decision and that "[f]iling a charge of discrimination with the EEOC is a protected activity." Thomas-Taylor v. City of Pittsburgh, No. 13-164, 2014 WL 4079944, at *7 (W.D. Pa. Aug. 18, 2014); see Anderson v. Davila, 125 F.3d 148, 161 (3d Cir. 1997). Clarion University, however, contends that Dr. Obotetukudo failed to allege a causal connection between his termination and the EEOC charge. This court recently described the plaintiff's burden with respect to causation in a retaliation case as follows:

> [P]laintiff must demonstrate a causal link between the protected activity and adverse employment action. Plaintiff must provide enough evidence to allow a reasonable jury to infer that there was retaliatory intent and that the intent to retaliate was a but-for cause of the adverse employment action. In other words, plaintiff must demonstrate that the employer would not have taken the adverse action absent the desire to

---

[7] Dr. Obotetukudo alleges that he was denied promotions in 2001, 2002, and 2005. However, those actions were not raised in the operative EEOC charge (ECF No. 40-1) and therefore are not properly before the Court. See, e.g., Barzanty v. Verizon PA, Inc., 361 F. App'x 411, 413 (3d Cir. 2010) (noting that an employment discrimination case under Title VII is "limited to claims that are within the scope of the initial administrative charge."). They also are time barred. See Mikula v. Allegheny Cnty., 583 F.3d 181, 185 (3d Cir. 2009) ("Under Title VII, a claimant in Pennsylvania must file a discrimination charge with the EEOC within 300 days of an unlawful employment practice."). Finally, because the denial of a promotion is a "discrete act" that would be individually actionable if raised in a timely manner, it cannot be considered part of a "continuing violation." See Morgan, 536 U.S. at 113 (discussing the distinction between discrete acts and continuing violations and noting that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

retaliate. Nassar, 133 S. Ct. at 2533. Proof of causation may be established in a number of ways. First, temporal proximity can serve as circumstantial evidence "'sufficient to raise the inference that [plaintiff's] protected activity was the likely reason for the adverse action.'" Kachmar v. SunGard Data Sys., Inc., 109 F.3d 173, 177 (3d Cir. 1997) (quoting Zanders v. Nat'l R.R. Passenger Corp., 898 F.2d 1127, 1135 (6th Cir. 1990)). "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of the plaintiff's *prima facie* case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." Kachmar, 109 F.3d at 178. The "mere fact that [an] adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." Robinson v. City of Pittsburgh, 120 F.3d 1286, 1302 (3d Cir. 1997), *abrogated on other grounds by* Burlington N., 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345. The timing must be "unusually suggestive" to raise an inference of causation. Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (internal quotation marks omitted). Generally, a lapse of several months between the plaintiff's complaint and termination is not unusually suggestive of a retaliatory motive. See Groeber v. Friedman & Schuman, P.C., 555 F. App'x 133, 136 (3d Cir. 2014) (three-month gap); Bailey v. Commerce Nat'l. Ins. Servs., Inc., 267 F. App'x 167, 170 (3d Cir. 2008) (four-month gap); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 232–33 (3d Cir. 2007) (three-month gap); Williams v. Phila. Hous. Auth. Police Dep't, 380 F.3d 751, 760 (3d Cir. 2004) (two-month gap). In contrast, a lapse of a few days suggests a retaliatory motive sufficient to establish causation for the prima facie case. See Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 369 (3d Cir. 2008) (gap of three working days); Jalil v. Avdel Corp., 873 F.2d 701, 708 (3d Cir. 1989) (two-day gap).

Absent temporal proximity, "circumstantial evidence of a 'pattern of antagonism' following the protected conduct can also give rise to the inference." Kachmar, 109 F.3d at 177 (quoting Zanders, 898 F.2d at 1135). Temporal proximity and a pattern of antagonism are not the only means to prove causation; the proffered evidence as a whole may be sufficient to raise an inference of intent. Id.

Thomas-Taylor, 2014 WL 4079944, at *7.

Here, Dr. Obotetukudo's termination did not occur until over one year after he filed his EEOC charge. As such, the temporal proximity between the two events is not unusually suggestive of retaliation. Thomas-Taylor, 2014 WL 4079944, at *7 ("Generally, a lapse of

17

several months between the plaintiff's complaint and termination is not unusually suggestive of a retaliatory motive."). Dr. Obotetukudo, however, provided sufficient factual allegations to support an inference that his EEOC charge was greeted with "a pattern of antagonism." Kachmar, 109 F.3d at 177. Most pertinently, Dr. Obotetukudo alleges that Clarion University's president, Dr. Whitney, twice threatened him with termination in connection with his EEOC charge. The first of these incidents occurred at a meeting on August 30, 2011, when Dr. Whitney allegedly directed him to "move on" from Clarion University because "[y]ou are not happy with the University and the University is not happy with you." (ECF No. 39, ¶ 172.) Dr. Obotetukudo interpreted this to mean that he would be terminated if he refused to withdraw his EEOC complaint. (Id. ¶ 173.) One month later, on September 21, 2011, Dr. Whitney wrote a letter to Dr. Obotetukudo in which she "directed Plaintiff to retract and withdraw Plaintiff's action of filing discrimination complaints with the Equal Opportunity Employment Commission in 2011 and 2010, so as to release [Clarion University] from the EEOC charges." (Id. ¶ 175.) Dr. Obotetukudo contends that the letter phrased this instruction in the form of an "ultimatum" with respect to his continued employment at the university. (Id.)

In addition to the direct threats outlined above, Dr. Obotetukudo asserts that Clarion University officials responded to his EEOC charge by threatening him with an investigation over the content of a course he had developed (ECF No. 39, ¶ 156) and denying him sabbatical leave despite being ranked fifth on a list of fifteen applicants, the rest of whom all had their applications granted. (Id. ¶¶ 164, 233.) Dr. Obotetukudo also contends that Clarion University deliberately excluded him from several departmental meetings. (Id. ¶¶ 176, 178.)

At this stage in the proceedings, the Court finds that these allegations are sufficient to create an inference that Dr. Obotetukudo's protected activity was the but-for cause of his

termination.[8]  Specifically, the facts alleged in the amended complaint suggest that his EEOC charge precipitated a pattern of antagonistic acts, including direct threats, eventually resulting in his removal from the university.  Dr. Obotetukudo's claim of retaliation is sufficiently plead for him to proceed to discovery on his retaliation claim.

### C.  Hostile Work Environment (Count Three)

To establish the *prima facie* elements of a hostile work environment claim under Title VII, a plaintiff must allege that (1) he suffered intentional discrimination because of his membership in a protected class; (2) the discrimination was severe and persuasive; (3) the discrimination detrimentally affected him; (4) the discrimination would have detrimentally affected a reasonable person in the same position; and (5) the existence of *respondeat superior* liability.  Bonenberger v. Plymouth Twp., 132 F.3d 20, 25 (3d Cir. 1997).  The alleged harassment must be so pervasive or severe as to "alter the conditions of . . . employment and create an abusive working environment."  Meritor Savings Bank FSB v. Vinson, 477 U.S. 57, 67 (1986).  Title VII applies to "both 'facially neutral mistreatment . . . [and] overt [ethnic] discrimination . . . [which] in sum constitute[] the hostile work environment.'"  Cardenas v. Massey, 269 F.3d 251, 261 (3d Cir. 2001) (alterations in original) (quoting Durham Life Ins. Co. v. Evans, 166 F.3d 139, 148 (3d Cir. 1999)).  In determining whether this standard is met, courts look to the totality of the circumstances including the frequency of the discriminatory

---

[8] Clarion University suggests that Dr. Obotetukudo cannot establish that his EEOC charge was the but-for cause of his termination because he admits that he was nominally terminated for an inappropriate interaction with a student. (ECF No. 41 at 18.)  Dr. Obotetukudo responds that the university's stated reason for his termination was a pretext for unlawful discrimination.  (ECF No. 39 ¶¶ 180-202.)  This issue must  be resolved at the summary judgment stage, rather than on a Rule 12(b)(6) motion.  See, e.g., Bartlett v. Kutztown Univ., No. 13-4331, 2015 WL 766000, at *8 n. 11 (E.D. Pa. Feb. 23, 2015) (noting that a plaintiff responding to a Rule 12(b)(6) motion "need not establish by a preponderance of evidence that Defendants' purported reason for terminating Plaintiffs' employment . . . was a pretext for discriminatory conduct" because  "the McDonnell Douglas burden-shifting standard does not apply" at the motion to dismiss stage); Hibbard v. Penn-Trafford School Dist., No. 13-622, 2014 WL 640253, at *5 n. 7 (W.D. Pa. Feb. 19, 2014). ("Because a Rule 12(b)(6) motion to dismiss merely tests the legal sufficiency of the complaint, it is necessary only to determine whether plaintiff's complaint sets forth a *prima facie* case of . . . discrimination, as evidentiary burdens are inapposite at the pleadings stage.") (citation omitted).

conduct, its severity, whether it is physically threatening or humiliating, and whether it interferes with an employee's work performance. Id.

In his amended complaint, Dr. Obotetukudo provides an exhaustive list of conduct that he viewed as harassment.[9] Most of these incidents are facially neutral, including his allegations that he was subjected to numerous interim performance evaluations (id. ¶ 36, 126, 137), some unidentified person broke into his office and stole his grade book (id. ¶ 221), and his heating system, telephones, and computers frequently broke down and were not repaired in a timely manner. (Id. ¶¶ 223, 226, 228.) While the court recognizes that discrimination in the workplace can manifest itself through facially neutral conduct, the plaintiff must point to "surrounding circumstances that would expose the purportedly discriminatory nature of what is otherwise . . . neutral conduct." Brooks v. CBS Radio, Inc., No. 07-519, 2007 WL 4454312, at *12 (E.D. Pa. Dec. 17, 2007). In the instant case, Dr. Obotetukudo failed to connect the majority of these incidents to his membership in a protected class. For example, Dr. Obotetukudo entirely attributes the conduct that he most strenuously objects to – his subjection to constant interim performance evaluations – to "his advocacy and abrasiveness with regards to issues of diversity and scholarship on the campus of Clarion University," rather than to his race, gender or religion. (Id. ¶ 36.) He attributes most of the other incidents, such as his heat, telephone, and computer not working, to a retaliatory motive, rather than discrimination. (Id. ¶ 223, 226, 228.)

Many of Dr. Obotetukudo's other allegations of harassment are fantastic, even fanciful. These include his allegations that Clarion University utilized a network of "spies and agents" to

---

[9] Clarion University again argues that many of these allegations are unexhausted or time barred. In Dr. Obotetukudo's EEOC charge, he alleges that he suffered "years of a hostile environment of harassment." (ECF No. 40-1, at 2.) It is well-established that a plaintiff may proceed with a hostile environment claim on a "continuing violation" theory. See Morgan, 536 U.S. at 122 ("[A] charge alleging a hostile work environment claim . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period.").

follow and monitor his movements across the United States while he was on vacation with his family (Id. ¶ 167), conspired with the mayor and chief of police of a small town in California to effectuate a house raid (Id. ¶ 169), implanted aggressive Pennsylvanians in a Best Western hotel in California to intimidate him and monitor his movements (Id. ¶ 83), embedded female students and faculty members in his classes to bait him into sexual harassment and inappropriate behavior (Id. ¶ 230-31), and "hired, paid, and subsidized" students to act as informants and "secret agents" in order to disrupt his classes and spy on his movements. (Id. ¶ 247, 250-51.) Even if these allegations were not entirely fanciful, Dr. Obotetukudo attributes most of them to the university's anger over his EEOC filing, rather than his race, gender, or religion.

The incidents that Dr. Obotetukudo does directly attribute to a protected characteristic – in particular, the comments about him being "short as an ape" and "a disgrace to his ethnicity" – fail to allege the type of "severe or pervasive" conduct that is actionable as a hostile work environment under Title VII. Bonenberger, 132 F.3d at 25. As explained by the Supreme Court, "offhand comments and isolated incidents (unless extremely serious)" are not sufficient to sustain a hostile work environment claim. Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1988). Courts have consistently applied this rule to reject hostile environment claims based on a handful of racially charged allegations. See, e.g., Page v. City of Pittsburgh, 114 F. App'x 52, 54 (3d Cir. 2004) (finding no hostile work environment where the "allegations of discrimination were limited to a series of isolated instances"); King v. City of Phila., 66 F. App'x 300, 305 (3d Cir. 2003) (concluding that a single racial epithet followed by a physical altercation and the threat of sabotage to plaintiff's work record did not demonstrate a pervasive atmosphere of harassment); Deans v. Kennedy House, Inc., No. 11-7125, 2014 WL 715583, at

*14 (E.D. Pa. Feb. 25, 2014) (occasional derogatory comments from defendants, coupled with heightened scrutiny of plaintiff's job performance and various disciplinary actions, did not create a hostile working environment); Eric v. Donsco Inc., No. 09-1052, 2010 WL 5018574, at *6 (M.D. Pa. Oct. 12, 2010) (allegation that defendants called plaintiff a "black monkey," stole his lunch, broke his radio, and tampered with his lock were "isolated events" that did not rise to the level of a Title VII violation). Consequently, his allegations fall short of the level of pervasive and severe conduct required by Title VII and this claim must be dismissed.

### D. Gender Discrimination (Count Four)

In Count Four of his complaint, Dr. Obotetukudo asserts a gender-based discrimination claims pursuant to Title VII. To establish a *prima facie* case of sex discrimination under Title VII, a plaintiff must show that: (1) he belongs to a protected class; (2) he was qualified for the position; (3) he was subjected to an adverse employment action; and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." Mandel v. M & O Packaging Corp., 706 F.3d 157, 169 (3d Cir. 2013) (citing Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008)). The fourth prong can be established by showing that similarly situated individuals who were not members of the protected class were treated more favorably than the plaintiff. Nguyen v. AK Steel Corp., 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (citing Jones v. Sch. Dist. of Phila., 198 F.3d 403, 410-11 (3d Cir. 1999)).

In his amended complaint, Dr. Obotetukudo alleges that the university president, a former dean, and the chair of his academic department were each female and that he was replaced by a female following his termination. (ECF No. 39, ¶¶ 237-39.) The court has already held that these allegations are sufficient to raise a plausible inference of gender-based discrimination at this stage in the proceedings. (ECF No. 36, at 15-16.) See, e.g., Pivirotto v.

Innovative Sys., Inc., 191 F.3d 344, 355-56 (3d Cir. 1999) (noting that replacement by a person of the opposite gender may raise an inference of discrimination); Williamson v. Penn Millers Ins. Co., Civil No 04-1142, 2005 WL 3440633, at *6 (M.D. Pa. 2005) (concluding that the plaintiff had raised an inference of discrimination by alleging that they were replaced by a person outside of the protected class); Kargbo v. Phila. Corp. for Aging, 2014 WL 1632193, at *8 (E.D. Pa. Apr. 22, 2014) (same); Bielich v. Johnson & Johnson, Inc., 6 F. Supp. 3d 589, 607 (W.D. Pa. 2014) (same).

### E.  Religious Discrimination (Count Five)

In order to state a *prima facie* case of Title VII discrimination based on his religion, a plaintiff must allege that (1) he is a member of a protected class; (2) that he suffered some form of adverse employment action; and (3) "this action occurred under circumstances giving rise to an inference of unlawful discrimination that might occur when nonmembers of the protected class are treated differently." Miller v. Keystone Blind Ass'n/Tpm, 547 F. App'x 100, 102 (3d Cir. 2013).  In the instant case, Dr. Obotetukudo describes himself as someone who "believes in God, but does not attend any particular church" and "[does] not profess any one religious beliefs [sic] over the other."  (ECF No. 39 ¶ 254.)  Assuming these amorphous beliefs place him in a protected class, his claim fails because he cannot satisfy either of the remaining two elements of a religion-based retaliation claim.

In attempting to state a claim, Dr. Obotetukudo generally avers that his advancement at Clarion University was limited by his refusal to attend Christian church services and his "non-professed Christian religious practices." (Id. ¶¶ 246, 249.)  He states that a co-worker once told him that "only good Christians get promoted" at Clarion University.  (Id. ¶ 246.)  He accuses the Dean of the College of Arts and Sciences, a Jehovah's Witness, of embedding more than

200 Jehovah's Witness students in his classes in order to "spy and report back to her on Plaintiff's classroom management, and content appropriateness, according to her religious beliefs." (Id. ¶ 247.) He similarly accuses unspecified individuals within the university's administration of "implanting" Christian and Muslim students and "wives and daughters or preachers and pastors" in his classes to "test his religiosity" and report back to administration concerning "his utterances on religious beliefs and/or matters in the classroom." (Id. ¶¶ 250-51.) Finally, he contends that an unusual number of students "presented speeches on abortions and belief in Christ" in his classes and that one student dropped a Bible and a book on abortion on his porch. (Id. ¶¶ 255-56.)

While each of these incidents establishes that Dr. Obotetukudo occasionally encountered a student or administrator's religious beliefs, he failed to allege any facts suggesting that his religion (or lack of religion) caused him to be differently treated. He did not identify any particular employment action that stemmed from his refusal to attend religious services or from the presence of Christian and Muslim students in his classes, and failed to provide any examples of other individuals who were treated more favorably because they professed a different religion. Many of his allegations, such as his belief that the university embedded hundreds of religious students in his classes for nefarious purposes, are fanciful. Others are contradictory and illogical.[10] Finally, and most critically, Dr. Obotetukudo does not allege that a religious motive played any part in his termination or the denial of his request for sabbatical leave, the only adverse employment actions within the scope of his February 2012

_____

[10] For instance, at one point Dr. Obotetukudo states that "only good Christians get promoted" at Clarion University, suggesting that he was discriminated against based on his non-Christian beliefs. (Id. ¶ 246.) He, however, later avers that "non-Christians have been hired, retained and promoted in Clarion University, while he was singled out for punishment and treated disparately because of his non-professed Christian religious practices." (Id. ¶ 249.)

EEOC charge.  See Barzanty, 361 F. App'x at 413 (limiting Title VII claims to incidents "that are within the scope of the initial administrative charge.").  In light of the foregoing, Dr. Obotetukudo's religion-based discrimination claim must be dismissed for failure to state a claim.

### F.  Racial Discrimination (Count Six)

Dr. Obotetukudo's racial discrimination claim is evaluated pursuant to the same standard as his religious discrimination claim.  See, e.g., Roebuck v. Drexel Univ., 852 F.2d 715, 726 (3d Cir. 1988).  It is undisputed that Dr. Obotetukudo, a naturalized citizen of Nigerian origin, is a member of a protected class.  He, however, failed to connect his status as an African American to his termination or any other specific adverse employment action.

In broad brush, Dr. Obotetukudo asserts that he suffered racial discrimination because he was never promoted beyond the position of associate professor and consistently received negative performance evaluations.  The bulk of Dr. Obotetukudo's factual averments, however, are vague and conclusory, and few relate to his termination or the denial of his request for a sabbatical.  The only properly exhausted incident cited in his amended complaint – his own termination – resulted in Dr. Obotetukudo being replaced by an African American.  Although a discrimination claim cannot be defeated simply because a member of a protected class was replaced by another protected class member, it is axiomatic that his replacement by a member of the same protected class offers no support for his contention that individuals outside of the protected class were more favorably treated.  See, e.g., Pivirotto v. Innovative Systems, Inc., 191 F.3d 344, 352-57 (3d Cir. 1999).  Although Dr. Obotetukudo contends that two other African American professors were also removed from the faculty of Clarion University during his tenure, he acknowledges that one of them was "given [a] golden hand-shake of early

retirement due [to] his years of service," a situation not suggestive of discrimination. (Id. ¶ 285.)

The remainder of Dr. Obotetukudo's allegations relate to Clarion University's refusal to promote him in 2001, 2002, and 2005. As discussed above, those incidents fall well outside of the scope of his EEOC charge and are not properly before the court. Even if properly exhausted, those allegations are insufficient to support an inference of racially motivated conduct. For example, Dr. Obotetukudo alleges that he was the only faculty member hired in 1994 that never received a promotion beyond assistant professor. (ECF No. 39 ¶ 274.) He, however, also states that the two other African American professors hired that year were each promoted to full professorships. (Id. ¶ 273-74.) He later concedes that there has been "some modicum of improvements in the hiring, retention, and promotion of ethnic and gender minority faculty members into the Clarion University," although he describes this progress as "meagre and very snail-like." (Id. ¶ 290.) Finally, a thorough review of his complaint reveals that Dr. Obotetukudo largely attributed his own lack of career advancement to his outspoken nature and his advocacy, rather than his race. Given the lack of specificity with respect to his racial discrimination claim, this claim must be dismissed.

### G. PHRA Claims

For each of his discrimination claims brought under Title VII, Dr. Obotetukudo asserts a parallel claim pursuant to the PHRA. It is well-settled that PHRA claims are subject to the immunity afforded to states and state agencies by the Eleventh Amendment. See U.S. CONST. amend. XI ("The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."); Patterson v. PA Office of

Inspector Gen., 243 F. App'x 695, 696 (3d Cir. 2007) (noting that Pennsylvania had not waived its immunity from suits under the PHRA in federal court); Mitchell v. Miller, 884 F. Supp. 2d 334, 380-81 (W.D. Pa. 2012) ("Although the PHRA waives Pennsylvania's immunity from actions brought in Pennsylvania courts, federal courts throughout the Commonwealth have consistently held that the applicable language of the PHRA does not operate as a waiver of Pennsylvania's Eleventh Amendment immunity."). Courts have consistently extended Eleventh Amendment immunity to the members of PASSHE, including Clarion University. See, e.g., Skehan v. State Sys. of Higher Educ., 815 F.2d 244, 247-49 (3d Cir. 1987) (holding that the State System for Higher Education was entitled to Eleventh Amendment immunity); O'Hara v. Ind. Univ. of Pa., 171 F. Supp. 2d 490, 495-98 (W.D. Pa. 2001) (holding that each of the "fourteen component universities" of the State System enjoyed Eleventh Amendment immunity); Toth v. Cal. Univ. of Pa., 844 F. Supp. 2d 611, 648 (W.D. Pa. 2012) (reaching the same conclusion with respect to California University of Pennsylvania, another of the fourteen component universities in the State System). Consequently, Dr. Obotetukudo's PHRA claims will be dismissed.

### H. Pennsylvania Whistleblower Act Claim (Count Seven)

The Pennsylvania Whistleblower Law makes it unlawful for an employer to "discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste." 43 PA. CONS. STAT. § 1423(a). A civil action for an alleged violation of the Pennsylvania Whistleblower Law must be filed "within 180 days after the occurrence of the

alleged violation." 43 Pa. Cons. Stat. § 1424(a). "'[T]his 180-day time limit is mandatory, and courts have no discretion to extend it.'" Guthrie v. Bradley, No. 06-619, 2008 WL 4279805, at *14 (W.D. Pa. Sep. 15, 2008) (quoting O'Rourke v. Pa. Dep't of Corr., 730 A.2d 1039, 1042 (Pa. Commw. Ct. 1999)).

In his amended complaint, Dr. Obotetukudo contends that he engaged in protected activity within the meaning of the Pennsylvania Whistleblower Law on two occasions: when he wrote a formal letter of complaint to the former president of Clarion University on December 6, 2009, and when he filed antidiscrimination charges with the EEOC in August 2010. (ECF No. 39, ¶¶ 302, 307.) Dr. Obotetukudo alleges that Clarion University responded to his complaints by engaging in several retaliatory acts that took place between November 23, 2009, and July 15, 2011. (Id. ¶¶ 302-10.) Dr. Obotetukudo, however, did not raise these claims until September 23, 2014, over two-and-a-half years after the last alleged instance of retaliation. As such, his claims based on the Pennsylvania Whistleblower Law are clearly time barred. 43 Pa. Pa. Cons. Stat. § 1424(a); Guthrie, 2008 WL 4279805, at *14.

### I.   Defamation (Count Eight)

Count Eight of Dr. Obotetukudo's complaint raises a state-law claim for defamation. (ECF No. 39 ¶¶ 311-28.) As noted above, Clarion University is "entitled to the protection of the Eleventh Amendment in this court." O'Hara, 171 F. Supp. 2d at 498. This immunity extends to pendent state law claims. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 120-21 (1984) (holding that "the Eleventh Amendment should not be construed to apply with less force to [pendant claims] than it does to the explicitly granted power to hear federal claims."). Consequently, this court may not exercise supplemental jurisdiction over Dr. Obotetukudo's defamation claim against Clarion University. See, e.g., Lewen v. Edinboro

<u>Univ. of Pa.</u>, No. 10-164, 2011 WL 4527348, at *8 (W.D. Pa. Sep. 28, 2011) (holding that the Eleventh Amendment precluded a defamation suit in federal court against Edinboro University, a PASSHE member).

### J.  Leave to Amend

The Third Circuit Court of Appeals has instructed that "if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile." <u>Phillips v. Cnty. of Allegheny</u>, 515 F.3d 224, 236 (3d Cir. 2008).  An amendment is futile if the amended complaint cannot withstand a renewed motion to dismiss.  <u>Shane v. Fauver</u>, 213 F.3d 113, 116 (3d Cir. 2000).

In the instant case, amendment would be clearly futile with respect to Dr. Obotetukudo's PHRA claims, his Pennsylvania Whistleblower Law claim (Count Seven), and his Defamation claim (Count Eight).  Each of those claims suffers from legal defects that cannot be cured by amendment.  As to his Wrongful Termination (Count One), Religious Discrimination (Count Five), and Racial Discrimination (Count Six) claims, Dr. Obotetukudo again failed to state a claim despite being granted an opportunity to correct the legal deficiencies in his original complaint and despite filing a meticulously detailed, 176-page amended complaint.  Since Dr. Obotetukudo was afforded an opportunity to correct the deficiencies identified in the prior complaint with respect to those claims, and the factual and legal grounds proffered in support of the complaint make it clear that Dr. Obotetukudo has no right to relief, granting further leave to amend would be futile or result in undue delay.  <u>Alston v. Parker</u>, 363 F.3d 229, 235 (3d Cir. 2004).

**V.     Conclusion**

For the reasons set forth above, Clarion University's motion to dismiss is granted in part and denied in part.  Clarion University's motion will be granted with respect to Count One (wrongful termination), Count Three (hostile work environment), Count Five (religious discrimination), Count Six (racial discrimination), Count Seven (Pennsylvania Whistleblower Law), and Count Eight (defamation).  Each of those claims will be dismissed with prejudice.

With respect to Count Two (retaliation) and Count Four (gender discrimination), Clarion University's motion to dismiss is denied.


An appropriate order follows.

By the court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated:  April 2, 2015